Filed 11/14/14  P. v. Crossno CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E058142 |
| v. | (Super.Ct.No. FSB1200584) |
| PRICE CROSSNO, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Kyle S. Brodie, Judge.  Affirmed with directions.

Susan L. Ferguson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Kimberley A. Donohue, and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

1

I

INTRODUCTION

A jury convicted defendant Price Crossno of first degree burglary (Pen. Code, § 459;[1] count 1), attempted indecent exposure (§§ 664, 314, subd. (1); count 2), and indecent exposure (§ 314, subd. (1); count 3). The trial court sentenced defendant to six years in prison.

Defendant contends insufficient evidence supported his convictions for attempted indecent exposure and burglary. He also contends the trial court erred in failing to instruct the jury sua sponte on the abandonment defense and in finding there was insufficient evidence to declare a doubt as to defendant's competency. Defendant further asserts that his sentence for attempted indecent exposure should have been stayed under section 654 and the trial court miscalculated his presentence custody credits. The People add that the abstract of judgment should be modified to reflect the trial court's order that defendant must register as a sex offender under section 290, subdivision (c).

We conclude there was sufficient evidence to support defendant's convictions for attempted indecent exposure and burglary, and there was no prejudicial error in the trial court not instructing on abandonment. We also conclude there was substantial evidence supporting the trial court's finding that defendant was competent to stand trial. The trial court, however, erred in not staying defendant's concurrent sentence for attempted indecent exposure (count 2) under section 654. In addition, defendant's presentence

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

2

custody credits were miscalculated and therefore must be increased to 438 days. Also, the abstract of judgment must be amended to state that defendant is required to register as a sexual offender under section 290, subdivision (c). In all other regards, the judgment is affirmed.

II

FACTS

*A. July 15, 2011, Indecent Exposure Incident*

Around 6:00 a.m., on July 15, 2011, Cynthia Dunham began working at her office on the second floor of the Centennial Plaza building, in Redlands. After about 20 minutes, Dunham went to the women's restroom, which was located down the hall from Dunham's office and was shared by others in the building. The women's bathroom was adjacent to the men's restroom. While alone inside the women's restroom, Dunham heard someone enter the men's restroom, flush the toilet, turn on the faucet, and then open the door. Dunham did not hear the door of the men's restroom close. Dunham was alarmed because only women normally worked at her office building at such an early hour. Occasionally homeless people used the bathrooms by slipping in through an unlocked door.

Dunham waited in the women's restroom, hoping to hear the person in the men's restroom leave. After several minutes, Dunham decided she needed to return to work and could not wait any longer. As Dunham exited the women's restroom and walked past the men's restroom, she noticed the men's restroom door propped open. Dunham saw defendant standing in the men's restroom doorway with his pants lowered, exposing his

3

genitals, and with a "seductive" look on his face. Dunham quickly looked away and rushed down the hallway to her office. Dunham locked her office door and called 911. Dunham was alone in her office. By the time officers arrived about 20 minutes later, defendant had left.

Dunham testified at trial that, in February 2012, Redlands Police Detective Cynthia Gourlay discussed the July 2011 incident with Dunham and Dunham provided a description of defendant. A few days later, Gourlay contacted Dunham again and told her defendant had been apprehended. Gourlay took Dunham to the location where defendant was detained and Dunham identified him. Dunham also identified defendant in court.

Gourlay testified that during her investigation of the July 2011 bathroom incident, Dunham told her in February 2012, that defendant had returned to the building. At that point, defendant had not yet been identified as the perpetrator. A day later, Gourlay met with the building cleaning crew supervisor, who told Gourlay a backpack had been left in one of the locked office suites. Gourlay found papers addressed to defendant in the backpack. Gourlay then searched a database to get a physical description of defendant. Defendant's driver's license provided a description of him, which was similar to the description Dunham had provided law enforcement.

About five days later, Gourlay heard on the police radio that police officers had detained defendant. Gourlay immediately told the officers she was investigating defendant and transported Dunham to where defendant was located for an in-field identification. Dunham identified defendant as the perpetrator of the July 2011 indecent

4

exposure incident. Defendant was arrested. Gourlay interviewed defendant regarding the indecent exposure incident. Defendant admitted he exposed himself to Dunham at the Centennial Plaza.

*B. February 7, 2012, Attempted Indecent Exposure Incident*

On February 7, 2012, Brandi Varvel, who was 21 years old, was living at Kimberly Apartments in Redlands, with her mother, April Varvel, and brother, Adam Varvel, who was 18 years old. While sleeping in her bedroom, Brandi awoke to the sound of defendant stepping on a bag of chips on her bedroom floor. Brandi testified at trial that she saw defendant standing in her room, sucking a lollypop, staring at her. Brandi asked defendant what he was doing. Defendant did not respond. He gestured at his pants. Brandi testified he was not wearing a belt. Brandi asked him again what he was doing. Defendant replied, "I'm going to show you," as he reached for the buttons on his pants and unbuttoned the first button. Brandi asked defendant, who are you? He did not reply. Brandi again asked defendant what he was doing. Defendant said he was going home and casually walked out of Brandi's bedroom.

Brandi testified that, while this was happening, she was thinking, "[w]ho is he and why is he in my house." Brandi feared what defendant might do. She was scared but did not scream. After defendant left, Brandi texted her mother, not realizing her mother had not yet left for work. When Brandi was about to send her mother the text, her mother walked down the hallway. Brandi burst into tears and told her mother what had happened. Brandi's brother, Adam, overheard the conversation. April also told Adam what had happened.

5

Brandi called her father, Charles Varvel, a retired police officer, who lived about one mile away. Within minutes of Brandi telling him about the incident, Charles drove to Brandi's apartment. On the way, Adam called Charles and said he had just talked to defendant in the hallway of the Kimberly Apartments complex. Defendant had asked Adam what was the quickest way to leave the building. Adam described defendant to Charles. Adam followed defendant across the street to an Albertson's grocery store. Charles went directly to Albertson's, where Adam and defendant were. Charles met Adam inside the store. Adam pointed out defendant to Charles. Charles confronted defendant in the store. While holding a gun, Charles told defendant he was under arrest and to get down on his knees. Defendant "danced around a little bit," yelling at Charles. As Charles grabbed defendant's jacket to put a choke hold on him, defendant pulled away and ran out of the store. While Charles was chasing defendant, Redlands Police Officer Jeff Spurlock pulled up in front of defendant and took him into custody.

Redlands Police Officer Carissa Jaquish was dispatched to Kimberly Apartments while Spurlock was detaining defendant. Jaquish testified she transported Brandi and Adam to where defendant was detained. Brandi identified defendant as the perpetrator and Adam identified defendant as the person he saw in the hallway, outside their apartment. Jaquish testified Brandi told her defendant had fidgeted with his jeans zipper. Jaquish did not recall Brandi saying defendant touched a jeans button or that the top button was undone. Brandi testified she recalled telling Jaquish defendant had fidgeted with his jeans zipper and was about to unbutton his pants.

6

Jaquish interviewed defendant at the police department the same day he was apprehended. During the taped interview, defendant said he was at Kimberly Apartments that day because he was looking for his wife, whose name is Kimberly. They have a son and daughter. Defendant said he thought he saw Kimberly with another daughter but he was not sure because his life had been so chaotic recently. Defendant did not know if he was married to Kimberly or separated. Defendant attempted to explain: "I've had several girlfriends, several um relationships where we had babies and uh, I'm just . . . I'm not sure of anything." When asked if Kimberly was expecting defendant to come over that morning, defendant said: "I think before that. Uh, somebody was before then. But, uh I didn't do the right thing I guess. [¶] . . . [¶] Um, I had, I, I've seen um, I mean I talked to a girl but I don't know for sure if she was Kimberly. I'm not sure, 'cause uh, she looks different all the time. Yeah. [¶] . . . [¶] I know that sounds crazy. [¶] . . . [¶] And I'm not crazy, swear to god ma'am."

When Jaquish asked defendant if he knew where Kimberly Apartments was, defendant responded, "Um, she can, she can change her color of hair and makeup and she, I mean, women are very, very um, . . . [¶] . . . [¶] they can look very different." When asked how he entered the Kimberly Apartments building, which was restricted to residents only, defendant said he entered a door that was open. He did not know which apartment was Kimberly's. Defendant added, "I knew her in uh, Riverside. She was the manager of Canyon Crest. [¶] . . . [¶] I don't think this is the same Kimberly is that Kimberly that uh, you know Kimberly that owns Kimber that had Kimberly Crest, she's passed away a long time ago right?" When Jaquish asked if defendant was talking about

7

his wife, defendant replied: "My wife she uh, she was part manager yeah so, she might have manager . . . might be a manager I don't know. Or she has a house some where I don't know. 'Cause I didn't see . . . ."

Jaquish asked defendant why he entered Kimberly Apartments. He said, "Just walk through there see if see if she was in there or anybody living there. 'Cause if they try to meet uh give people I know or see, see where some people of my family has, I'd like to be with my family." When asked if defendant knew anyone there or was going to a particular apartment, defendant said, "No. I just I thought I'd walk through and I was cold." After entering the Kimberly Apartment building, defendant knocked on a few doors. No one opened their door. Defendant denied going inside anyone's apartment. Defendant said he was trying to find his wife because her parents have money and she sold his car.

After Jaquish told defendant she knew he entered someone's apartment, defendant said, "Okay. I, I that, that one I heard someone say come in," after he knocked on the door, so he went in. Defendant said that, after entering, he took some change and left. Defendant added that there was a girl in the apartment. He did not know her. He said, "She could be my daughter for all I know, so I's like, that's why I left." Defendant told Jaquish he went inside because he thought he heard his daughter talking or "it could be a fake to get me in trouble . . . I could just being set up ma'am, but I didn't do anything." The girl said to defendant, "Do I know you or who are you and uh, I didn't tell her 'cause I what I'm thinkin' is uh, I mean I felt uncomfortable at that point." Defendant believed the girl could have been his daughter.

8

Defendant said nothing happened in the apartment. Defendant thought the girl said something sexual. He was there for only a second or two. "I don't think it was all just my mind, put all in my mind, like the psychiatrist said. I think the psychiatrist was wrong." Defendant believed the girl was leading him on, because of "the way her face was, her clothes where she had her top like this the way uh she was sitting up in the bed and she kept saying come here. . . ." Defendant did not know the girl. Defendant believed she was setting him up. The door was open, he was told to come in, and he walked in. Defendant said that, although the girl was very sexual, defendant was not interested in her because she was too young. Defendant denied motioning toward his pants or exposing himself to the girl.

Officer Gourlay also interviewed defendant. Gourlay asked defendant if Brandi asked him to show her his penis. Defendant denied she did and denied he was sexually aroused when he entered Brandi's room but conceded he was "[m]entally stimulated a little bit" and "my mind might been thinking that while I was uh going down the hall . . . ." Defendant said it was "implied" Brandi was "coming onto" him. Defendant denied he started unbuttoning his pants. Defendant said he probably went into Brandi's apartment because he wanted to have sex. He also wanted to talk to his wife and be loved by her. Defendant told Gourlay he was sexually frustrated and was hoping to have sex with someone in the apartment. Defendant said he heard the girl in the apartment say to come in when he knocked. He walked out of the apartment because he feared being shot. Defendant wanted to have sex with Brandi if she was willing and not too young. Defendant lost his sexual desire when she asked who he was and what he was doing.

9

Defendant said "that kind of shot me like for a loop." After defendant left the apartment, a young man followed defendant and told defendant something had happened to the man's sister in her apartment. Defendant wanted to get out of the building.

Defendant admitted he left his backpack inside the building at the Centennial Plaza. He said he sometimes spent the night there. Defendant also admitted he showed Dunham his penis in July 2011.

## III

## SUFFICIENT EVIDENCE OF ATTEMPTED

## INDECENT EXPOSURE

Defendant contends his conviction for attempted indecent exposure was not supported by substantial evidence. We disagree.

"'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citation.]' [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.)

Section 314, subdivision (1), provides in part that "[e]very person who willfully and lewdly . . . [¶] [e]xposes his person, or private parts thereof, . . . in any place where

10

there are present other persons to be offended or annoyed thereby," is guilty of indecent exposure. While the first offense is a misdemeanor, all following offenses are felonies. (§ 314, subd. (1).) Section 664 discusses the punishment provided for attempted offenses, and applies to "[e]very person who attempts to commit any crime, but fails, or is prevented or intercepted in his perpetration . . . ." "In general, under California law, '[a]n attempt to commit a crime is itself a crime and [is] subject to punishment that bears some relation to the completed offense.' [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 229.) There are two elements to an attempted crime: (1) specific intent to commit the crime, and (2) a direct but ineffectual act done to complete it, with the reason behind the act's incompletion being immaterial. (*Id*. at p. 229.)

"Generally, a conviction for indecent exposure requires proof of two elements: '(1) the defendant must willfully and lewdly expose the private parts of his person; and (2) such exposure must be committed in a public place or in a place where there are present other persons to be offended or annoyed thereby.' [Citation.]" (*People v. Carbajal* (2003) 114 Cal.App.4th 978, 982.) The terms "willful" and "lewdly" are construed by the Supreme Court to mean intended for direct public attention "'for purposes of sexual arousal, gratification, or affront.'" (*People v. Honan* (2010) 186 Cal.App.4th 175, 181.)

In the instant case, there was substantial evidence defendant willfully and lewdly attempted to expose himself. Such evidence included defendant's statements that, before entering Brandi's bedroom, he was "mentally stimulated" and wanted to have sex with somebody, and do "other things, too." After defendant entered Brandi's room and Brandi

11

asked defendant several times, "Who are you," and "What are you doing," he responded, "I'm going to show you," pointed to his pants, and began unbuttoning his pants. "When a defendant acts with the requisite specific intent . . . and performs an act that 'go[es] beyond mere preparation . . . and . . . show[s] that the perpetrator is putting his or her plan into action' [citation], the defendant may be convicted of criminal attempt." (*People v. Toledo, supra,* 26 Cal.4th at p. 230.) Here, there was evidence defendant went beyond mere preparation by beginning to unbutton his pants in front of Brandi. We therefore conclude the evidence was sufficient to support defendant's conviction for attempted indecent exposure.

IV

SUFFICIENT EVIDENCE OF BURGLARY

Defendant argues there was also insufficient evidence to support his burglary conviction because he lacked the requisite felonious intent when entering the victim's apartment.

Section 459 provides that any person, "who enters any house, room, apartment, . . . with intent to commit . . . any felony is guilty of burglary." Section 460, subdivision (a), provides, "[e]very burglary of an inhabited dwelling house, . . . is burglary of the first degree." The term "inhabited" means "currently being used for dwelling purposes, whether occupied or not." (§ 459.)

Here, defendant entered the Varvels' apartment uninvited. The apartment was inhabited by Brandi, her mother, and Brandi's younger brother. Defendant then entered Brandi's bedroom while she was sleeping. Defendant argues he lacked the requisite

12

intent under section 459 to be convicted of burglary since he did not intend to expose himself upon entering the apartment. However, the court in *People v. Sparks* (2002) 28 Cal.4th 71, 73 (*Sparks*), held that the defendant did not need the requisite felony intent before entering the victim's home to sustain a burglary conviction if that intent was formed before entering a room within the victim's dwelling. The intent to commit burglary can be formed after entering a building, but before entering the room where the defendant intends to commit the felonious act. (*Id.* at p. 82.)

Defendant argues that he did not enter either Brandi's apartment or bedroom with the intent to expose himself. Instead, he was looking for his wife. However, defendant admitted to Gourlay and Jaquish that he entered the apartment because he wanted to have sex and was "mentally stimulated" once he was inside the apartment and before he entered Brandi's bedroom. Defendant also said he was hoping to have sex with someone in the apartment. He stated that, since Brandi's bedroom door was open, he entered her room looking for a sexual partner because he was sexually frustrated. Under *Sparks,* entering a bedroom with felonious intent is sufficient to support a burglary conviction. (*Sparks*, *supra,* 28 Cal.4th at p. 88.)

Defendant argues that unlike in *People v. Rehmeyer* (1993) 19 Cal.App.4th 1758 (*Rehmeyer*), in the instant case there was insufficient evidence of intent to commit indecent exposure because he was not naked when he entered the Varvels' apartment or Brandi's room. In *Rehmeyer*, the court held that there was sufficient evidence to affirm the defendant's multiple counts of residential burglary and felony indecent exposure. (*Id.* at p. 1767.) The victim in *Rehmeyer*, awoke to find the uninvited defendant in her

13

bedroom doorway, nude, with his genitals obscured by furniture. (*Id*. at p. 1763.) On appeal the defendant argued in support of his contention that he did not intend to show his genitalia and that the victim had not seen his genitals. The court in *Rehmeyer* held that defendant's arguments were based on speculation and conjecture. (*Id*. at p. 1765.) There was no evidence to indicate that the defendant purposefully hid his genitals from view from the victim. (*Id*. at p. 1765.) The court concluded that, because of the defendant's history of lewd behavior and indecent exposure, it was reasonable for the jury to infer from the totality of circumstances that the defendant intended to expose himself. (*Id*. at pp. 1765-1766.)

Likewise, in the instant case, defendant had a history of committing indecent exposure. Although he was not naked, defendant conceded that, before entering Brandi's room, he was "mentally stimulated," sexually frustrated, and wanted to have sex. There was also evidence that after defendant entered Brandi's room, Brandi awoke to discover defendant, uninvited, in her bedroom, staring at her. When she asked defendant repeatedly, "Who are you?" and "What are you doing?," he replied only with, "I'm going to show you," while unbuttoning his pants. Although defendant did not expose his genitals to Brandi before he left the apartment, the trier of fact could reasonably find that defendant intended to expose himself before entering Brandi's room, particularly given evidence that he had previously exposed himself to Dunham within the past year. (*Rehmeyer*, *supra*, 19 Cal.App.4th at p. 1765.) "When the evidence justifies a reasonable inference of felonious intent, the verdict will not be disturbed on appeal." (*Id*. at p.

14

1766.) We thus conclude there was substantial evidence to support defendant's burglary conviction.

V

ABANDONMENT INSTRUCTION

Defendant contends the trial court committed prejudicial error by failing to instruct the jury sua sponte on the abandonment defense regarding count 2. We disagree.

After discussing jury instructions on attempted indecent exposure, the parties agreed to the proposed instructions as read to the jury. The trial court instructed the jury on attempted indecent exposure by giving CALCRIM No. 460. Defendant argues for the first time on appeal that the trial court should have included the following bracketed, discretionary paragraph in CALCRIM No. 460 on abandonment, which the parties did not request and the court did not read to the jury:

"[A person who attempts to commit *<insert target offense>* is guilty of attempted *<insert target offense>* even if, after taking a direct step towards committing the crime, he or she abandoned further efforts to complete the crime or if his or her attempt failed or was interrupted by someone or something beyond his or her control. On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing *<insert target offense>*, then that person is not guilty of attempted *<insert target offense>*.]" (CALCRIM No. 460.)

Defendant has forfeited any claim of error in not instructing on abandonment because he did not request instruction on abandonment or object to the trial court not

15

giving the optional paragraph in CALCRIM No. 460 on abandonment. (*People v. Davis* (2009) 46 Cal.4th 539, 616-617.)

Forfeiture aside, we reject defendant's contention that the trial court should have sua sponte instructed on the abandonment defense. In general, the trial court has the duty to instruct the jury sua sponte on principles of law relevant to the issues raised by the evidence. (*People v. Wims* (1995) 10 Cal.4th 293, 303.) Additionally, a defendant is entitled to an instruction which pinpoints the theory of his defense. (*People v. Wharton* (1991) 53 Cal.3d 522, 570.) Such an instruction is one which "pinpoints the evidence in the case in the light of defendant's theory of defense and instructs the jury that the People bear the burden of ultimate persuasion on the issue which the instruction pinpoints." (*People v. Brady* (1987) 190 Cal.App.3d 124, 135, disapproved on another ground in *People v. Montoya* (1994) 7 Cal.4th 1027, 1040.) However, a defendant is entitled to a "pinpoint" instruction only upon request; there is no requirement that such an instruction be given sua sponte. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

Defendant acknowledges that there is no case law explicitly holding that a court has a sua sponte duty to give the bracketed paragraph on abandonment but argues that the bench notes for CALCRIM No. 460 state that the abandonment instruction should be given if abandonment is an issue. The following bench note states: "Give the bracketed paragraph that begins with 'A person who attempts to commit' if abandonment is an issue." There is no mention here that the abandonment paragraph must be given sua sponte, whereas other CALCRIM No. 460 bench notes state that the trial court has "a **sua sponte duty**" to instruct on the elements of the crime of attempt. The absence of any

16

mention of a sua sponte requirement regarding the abandonment defense indicates there is no sua sponte duty to give the abandonment instruction.

Instruction on abandonment in the instant case would have been a pinpoint instruction, relating particular facts of defendant's purported abandonment to the commission of the crime of attempted indecent exposure. Language on abandonment would have pinpointed part of defendant's defense. Therefore the trial court was not required to give the abandonment instruction sua sponte. (*People v. Saille, supra,* 54 Cal.3d at p. 1119.)

Furthermore, "[i]n the absence of a request for a particular instruction, a trial court's obligation to instruct on a particular defense arises '"only if [1] it appears that the defendant is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."' [Citations.]" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148.) Here, defendant did not rely on the defense of abandonment. Defendant relied on the theory he had no intention of committing indecent exposure. Defense counsel argued during closing argument that defendant entered the Varvels' apartment looking for his wife and, when he entered Brandi's room, he did not intend to expose himself and did not touch himself, expose himself, or begin undressing or unbuttoning his pants. Defense counsel noted there was evidence defendant was wearing a belt, which would have impeded defendant from unbuttoning or unzipping his pants. Defense counsel further argued nothing stopped or interrupted defendant's acts. There was no intent or immediate steps

17

taken to put in motion a plan to commit indecent exposure, and also no evidence of any circumstance interrupting the carrying out of such plan.

The trial court was not required to instruct sua sponte on the abandonment defense because defendant did not rely on the defense of abandonment below and the theory was inconsistent with his theory that he did not intend to commit indecent exposure, he did not take any acts in furtherance of committing the offense, and nothing stopped or interrupted his conduct of roaming the Varvels' apartment, looking for his wife.

In any event, any error in failing to give an instruction on "abandonment" was harmless beyond a reasonable doubt. There is no reasonable probability that, had the abandonment instruction been given, the jury would have found defendant not guilty of attempted indecent exposure. (*People v. Hughes* (2002) 27 Cal.4th 287, 363.) When considering a claim that an instruction was deficient, we look at the instructions as a whole to determine whether such error is reasonably likely to have caused the jury to misapply the law. Here, we conclude it was not reasonably likely the jury would have misapplied the law or that the outcome would have been different. (*People v. Carrington* (2009) 47 Cal.4th 145, 192.) Even under the *Chapman* standard of review (*Chapman v. California* (1967) 386 U.S. 18, 24), we conclude that, given the instructions as a whole, absence of the instruction on abandonment did not contribute to the verdict. (*People v. Sakarias* (2000) 22 Cal.4th 596, 625.) The jury was properly instructed on the elements of attempted indecent exposure, which included (1) defendant took a direct but ineffective step toward committing indecent exposure and (2) defendant intended to commit indecent exposure. Defendant's conviction reflects that the jury believed

18

Brandi's testimony that defendant began unbuttoning his pants and that, when she asked him what he was doing, defendant pointed to his pants and said, "I'm going to show you."

Not only was there substantial evidence supporting a finding defendant committed attempted indecent exposure, but in addition, any finding of abandonment would have been based on defendant's conduct committed after he began unbuttoning his pants, at which point the attempted offense had already been committed. We therefore conclude that, even assuming the trial court erred in not instructing on abandonment, it is not reasonably probable that such error would have resulted in a more favorable verdict.

VI

MOTION TO SUSPEND THE PROCEEDINGS BASED ON INCOMPETENCY

Defendant contends the trial court erred in failing to declare a doubt as to his competency to stand trial. We disagree.

*A. Procedural Background*

During the trial, defendant's recorded police interview was played for the jury. Defendant commented to his trial attorney during a break in showing the recorded interview that the voice on the recording was not his, that he was not the person who went into Brandi's bedroom, that the bag of chips on the bedroom floor moved by itself, and Brandi was not the person he saw in bed. Defendant said Jaquish was in Brandi's bed, wearing a negligee and the case was a conspiracy against him.

Upon resuming the proceedings, defendant's attorney, Randall Isaeff, moved to suspend the trial to assess defendant's competency to stand trial because of statements

19

defendant had made to Isaeff during the break.  Isaeff believed defendant was paranoid, delusional, and irrational, and this would interfere with defendant's ability to understand the criminal proceedings and assist in his defense.

The trial court took a recess and reviewed case law on the matter.  After resuming the hearing on Isaeff's motion to assess defendant's competency, the court denied the motion, finding there was insufficient evidence to support a finding of doubt as to defendant's competency and suspend the proceedings.

## B.  Applicable Law

Defendant argues that the record contains substantial evidence that he was mentally incompetent.  "Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847 (*Rogers*).)

Section 1368, subdivision (a), provides, in pertinent part, that "[i]f, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . .  At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time."

20

The court's duty to conduct a competency hearing may arise at any time prior to judgment. (*Rogers, supra,* 39 Cal.4th at p. 847.) Defense counsel's opinion is a factor for the court to consider in determining whether substantial evidence of a lack of competence exists. (*People v. Panah* (2005) 35 Cal.4th 395, 433.) If the trial court does not doubt defendant's competence, the court is not required to conduct a hearing under section 1368 based solely on defense counsel's opinion that defendant is incompetent. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1112.)

A defendant is mentally incompetent if, as a result of a mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (§ 1367, subd. (a).) In considering whether a defendant is competent, the trial court may consider the defendant's demeanor, irrational behavior, and prior mental evaluations. (*Rogers, supra,* 39 Cal.4th at p. 847.) We give deference to the trial court's determination of whether to hold a competency hearing, since the court has the advantage of observing the defendant during trial. "The failure to declare a doubt and conduct a hearing when there is substantial evidence of incompetence, however, requires reversal of the judgment of conviction." (*Rogers, supra,* 39 Cal.4th at p. 847.)

*C. Discussion*

The trial court reasonably concluded defendant's statements, made during his recorded police interview and to his attorney during the recess, may have suggested mental instability but did not demonstrate defendant was unable to understand the proceedings or assist in his defense. "Evidence . . . that does no more than form the basis

21

for speculation regarding possible current incompetence is not sufficient. [Citation.]" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1281.) More is required to raise a doubt of competence than mere bizarre actions or bizarre statements, which do not necessarily affect defendant's ability to assist in his or her own defense. (*People v. Danielson* (1992) 3 Cal.4th 691, 727; *Rogers, supra,* 39 Cal.4th at p. 847.)

Here, defendant's recorded statement indicated he understood he was being investigated for committing indecent exposure. Defendant denied he committed or attempted to commit indecent exposure and explained why he was innocent. Defendant claimed he was in Brandi's apartment merely because he was looking for his wife and wanted to have consensual sex with an adult female. Defendant denied he did anything improper in Brandi's room, claiming he left because he lost interest in Brandi when he discovered she was too young and she repeatedly asked what he was doing and who he was.

Although defendant's recorded statement and his statements made to defense counsel included odd, irrational statements, the court could conclude defendant was feigning mental incompetence or that such statements were not sufficient to establish defendant was unable to understand and assist in his defense. The court could reasonably find, based on the record as a whole, that there was insufficient evidence defendant was incompetent.

# VII

## SENTENCING ERROR

Defendant contends, and the People agree, that the trial court should have stayed defendant's sentence for attempted indecent exposure under section 654. Section 654 prohibits multiple punishment for both burglary and the underlying felony conviction, when the burglary was committed with the intention of committing the underlying felony and is part of an indivisible transaction. (*People v. Hester* (2000) 22 Cal.4th 290, 294; *People v. Price* (1991) 1 Cal.4th 324, 492.) Here, defendant was sentenced for burglary and for the underlying felony of attempted indecent exposure. Sentencing defendant for both crimes was improper under section 654. Therefore defendant's concurrent one-year sentence on the attempted indecent exposure conviction (count 2) must be stayed under section 654.

Defendant also asserts, and the People agree, that the trial court miscalculated his presentence custody time. The trial court credited defendant with a total of 231 presentence custody credits. Defendant's credits consisted of 201 actual days and 30 days conduct credit. Defendant was arrested on February 7, 2012 and remained in custody until sentenced on February 21, 2013. Defendant's actual days in custody therefore amounted to 381 days. Defendant was also entitled to credits for 15 percent of his actual time in custody, amounting to 57 days (15 percent of 381 days). (§ 4019.) Defendant should therefore receive a total of 438 days presentence custody credits (57 conduct credit days, plus 381 actual days).

23

In addition, the People correctly note in their respondent's brief that the abstract of judgment does not reflect that the trial court ordered defendant to register as a sex offender under section 290, subdivision (c). The abstract of judgment states that defendant must register under Health & Safety Code sections 11590 and 11594 (relating to controlled substances crimes), but does not reflect the trial court's order requiring registration as a sexual offender under section 290. "When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties. [Citation.]" (*People v. Jones* (2012) 54 Cal.4th 1, 89.) Therefore the abstract of judgment must be amended to show that defendant must register as a sexual offender under section 290.

VIII

DISPOSITION

Defendant's concurrent, one-year sentence for attempted indecent exposure (count 2) is ordered stayed under section 654. Defendant's presentence custody credits are ordered increased from 231 presentence custody credits to **438 days** of presentence custody credits. In all other regards, the judgment is affirmed.

The trial court is directed to correct the abstract of judgment to show that defendant must register as a sexual offender under section 290, subdivision (c). The superior court is ordered to issue a modified abstract of judgment reflecting the sentencing changes ordered by this court and also adding that defendant must register as a sex offender under section 290, subdivision (c). The trial court is further directed to

24

forward a certified copy of the amended abstract of judgment to the Department of

Corrections and Rehabilitation.  As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

RICHLI
J.